# Commonwealth, *ex rel.* Wolfe, *versus* Butler.

1. In order to justify a court in pronouncing an Act of the Legislature unconstitutional and void either in whole or in part, it must be able to vouch some exception or prohibition clearly expressed or necessarily implied. Where there is any doubt, it should be resolved in favor of the constitutionality of the act.

2. Where the contention is as to the meaning of a word, then any meaning, whether technical or popular, which will support the constitutionality of the act, must be adopted.

3. The provision of the act of May 11th 1874, Pamph. L. 129, entitling members of the General Assembly, in addition to a fixed compensation of one thousand dollars for each session not exceeding one hundred days, to a further compensation of ten dollars per day for the time necessarily spent after the expiration of the one hundred days, is not in conflict with article II., § 8, of the constitution, which provides that members of the General Assembly shall receive such *salary* as shall be fixed by law, and no other compensation whatever.

4. The term "salary," as used in said clause of the constitution, is to be considered synonymous with the term "wages."

February 2nd 1882. Before SHARSWOOD, C. J., MERCUR, GORDON, TRUNKEY, STERRETT and GREEN, JJ. PAXSON, J., absent.

ERROR to the Court of Common Pleas of *Dauphin county:* Of May Term 1882, No. 57.

Upon the petition of Charles S. Wolfe, a writ of alternative mandamus was issued in the name of the Commonwealth of Pennsylvania, directed to Samuel Butler, state treasurer, commanding him to pay to the petitioner the sum of $500, being the balance alleged to be due him upon a warrant in his favor for his compensation as a member of the house of representatives for the session of 1881. The respondent filed an answer, to which a replication was filed.

There was no dispute as to the facts, which were as fol-

99 535
157 137
99 535
199 555

99 535
20 SC ²492

99 535
23 SC ¹384

99 535
26 SC ²589

99 535
210 381
210 ¹391
210 413
210 ¹555
210 ¹589
27 SC ¹ 31

99 535
37SC 4

[Cowmonwealth *ex rel.* Wolfe *v.* Butler.]

lows:—The relator was a member of the house of representatives, and served as such during the session of 1881, which lasted from January 4th to June 9th 1881, a period of one hundred and fifty-eight days. By the Act of May 11th 1874, Pamph. L. 129, it is provided: "That the compensation of members of the General Assembly shall be one thousand dollars for each regular and each adjourned annual session, not exceeding one hundred days, and ten dollars per diem for time necessarily spent after the expiration of the one hundred days: provided however, that such time shall not exceed fifty days at any one session."

At the expiration of the session the relator received a warrant in due form for the sum of $1,577.20, of which $77.20 was for "stationery and mileage," and $1,500 for "compensation," for the said legislative session of one hundred and fifty-eight days.

Upon presentation of this warrant the state treasurer paid the sum of $1,077.20, but, acting under the opinion in writing of the attorney-general, which he had formally requested, refused to pay the balance of $500, being ten dollars per diem for fifty days "necessarily spent after the expiration of the one hundred days," on the ground that the said Act authorizing the payment of the same was in contravention of art. II., § 8, of the constitution, which provides:—"The members of the General Assembly shall receive such salary and mileage for regular and special sessions, as shall be fixed by law, and no other compensation whatever, whether for service upon committee or otherwise. No member of either house shall, during the term for which he shall have been elected, receive any increase of salary or mileage under any law passed during such term."

The relator thereupon filed his petition for a mandamus in the Court of Common Pleas of Dauphin county, jurisdiction having been expressly conferred upon that court to issue writs of mandamus to State officers, by Act of May 25th 1881, Pamph. L. 32.

The court (PEARSON, P. J., and HENDERSON, J.), after argument, filed an opinion, holding that the Act of 1874 is constitutional so far as it gives a fixed sum for the session, but that so much thereof as purports to give daily pay, in addition to a fixed sum, is unconstitutional and void. The court, therefore, refused to award a writ of peremptory mandamus, and entered judgment for the respondent.

The relator thereupon took this writ of error, assigning the said judgment for error.

*J. McD. Sharpe,* for the plaintiff in error.—The court will never declare an Act of Assembly void, unless it violates the

[Commonwealth *ex rel.* Wolfe *v.* Butler.]

Constitution clearly, palpably, plainly, and in such manner as to leave no doubt or hesitation in the mind of the court: Menges *v.* Wertman, 1 Barr 223 ; Sharpless *v.* Mayor of Philadelphia, 9 Harris 164 ; Speer *v.* School Directors, 14 Wr. 157 ; Erie, &c. R. R. Co. *v.* Casey, 2 Casey 287 ; Weister *v.* Hade, 2 P. F. S. 474 ; Commonwealth *v.* Hartman, 5 Harris 119 ; Commonwealth *v.* McCloskey, 2 Rawle 374 ; Pennsylvania R. R. Co. *v.* Riblet, 16 P. F. S. 169 ; Lewis's Appeal, 17 P. F. S. 165 ; Craig *v.* First Presbyterian Church, 7 Norris 46 ; Donohugh's Appeal, 5 Norris 310.

By the Constitution (art. II. § 8) the legislature had sole jurisdiction over the subject, and the amount of compensation to members of its own body. The argument that the Act of 1874 is unconstitutional rests upon the alleged meaning of the single word " salary "—that it excludes a *per diem* compensation under all circumstances. Now the word is not a term of art ; it has not a technical meaning in the law ; it has no exact meaning signifying the same thing under all circumstances ; it is unlike such terms as " fee simple," " dower," " remainder," " reversion," etc., which convey an exact idea. The lexicographers do not define it precisely similarly. It is generally defined as synonymous with stipend, pay, wages, hire, allowance : See Webster, Worcester, Encyclopedia Br., Bouvier, Tomlin, etc. It has been so considered in judicial decisions : Taylor *v.* Laird, 1 Hurls. & Nor. 266 ; Rundle *v.* Sheetz, 2 Miles 330 ; Ranck *v.* Albright, 12 Casey 371 ; Hutchinson *v.* Gormley, 12 Wr. 270. So also in Acts of Assembly : Acts of April 14th 1853, § 3, P. L. 359 ; May 5th 1864, § 3, P. L. 242 ; March 22d 1865, §§ 3, 6, 43, P. L. 9 ; April 11th 1866, §§ 3, 6, P. L. 68, 70 ; April 11th 1867, § 3, P. L. 2, 4 ; April 6th 1870, § 19, P. L. 21 ; May 27th 1871 § 17, P. L. 213 ; April 3d 1872, § 17, P. L. 7 ; April 9th 1873, § 31, P. L. 12 ; April 29th 1878, P. L. 33.

To argue that a compensation ceases to be a salary when it is measured by the day, is to beg the question. There is no essential difference in a per diem pay for three hundred and sixty-five days, and an equivalent lump sum for the year. The Constitution contains no express prohibition of the per diem method of compensation ; nor is there any such prohibition by necessary implication. The canon that words in a constitution shall be presumed to have their popular signification may be invoked to maintain the constitutionality of an Act, but never to destroy it—ut magis valeat quam pereat. The debates in the Constitutional Convention on the clause in question, relied on by the other side, were meager, and they shed no light on the question of construction. The absence of an express prohibition is in our favor. But if this were otherwise, the people who subsequently established the Constitution may have viewed the

[Commonwealth *ex rel.* Wolfe *v.* Butler.]

construction differently. The question is one of intrinsic meaning, not of extrinsic light. The evil intended to be remedied was extra pay for service on committees, and "salary grabbing," by increase of salary during the term of office, which the Constitution reformed, and against which the Act of 1874 does not offend.

Where it was intended in the Constitution to provide fixed salaries, that term is expressly used; but the words of the clause in question are "such salary" as shall be fixed by law. Fixed salaries are made applicable to officers whose duty is of fixed duration, as by the year. The sessions of the legislature, however, vary in duration with the exigencies of the public business. A proper salary for a session of one hundred days is insufficient for a session of one hundred and fifty days. A variable compensation is therefore as free from objection in ethics as in law. While the Constitution carefully distinguishes between salary and fees, and while it prohibits the legislature from increasing the salary of its members during their term, it does not prescribe a fixed salary, but vests in the legislature a discretion to provide such salary, *i. e.*, of what like or kind, as it may fix by law. This includes the method of measuring the salary as well as its amount, and leaves the legislature free to provide any mode of compensation that is not entirely destructive of every sense in which the word "salary" can be properly used. A per diem compensation is allowable, under the term "such salary," without doing violence either to correct definition or popular parlance.

The defendants in error seek not merely to destroy part of the act, and retain the rest—which may sometimes be done—but to destroy one part of a single sentence and retain the rest of it, which is novel, and cannot be done. The whole act is virtually in that sentence, and if unconstitutional at all, it is unconstitutional altogether, and in such case the legislature were untrammelled and had the right to appropriate to themselves the pay they did. The Act has stood unquestioned since its passage in 1874, and contemporaneous construction is a cumulative argument in favor of its constitutionality.

*Henry W. Palmer*, attorney-general, and *Charles R. Buckalew* (with them *Robert Snodgrass*, deputy attorney-general, and *Lyman D. Gilbert*), for the defendant in error.—It is a mistake to say that the Act of 1874 has remained unquestioned till now. At every session since its enactment it has received a practical protest from at least one senator (from Chester) who has refused to accept his extra per diem pay, because he believes it unconstitutional. The attorney-general in 1876, filed his opinion that the per diem provision was unconstitutional. The question did

[Commonwealth *ex rel.* Wolfe *v.* Butler.]

not become a practical one in the following year, because the legislature adjourned before the expiration of the one hundred days.

The language of a constitution is not to receive a technical construction, but words, not obviously technical, are to be construed according to their popular or familiar signification and import, having regard to the spirit and intention of the provision: Cronise *v.* Cronise, 4 P. F. S. 255; Farmers & Mechanics' Bank *v.* Smith, 3 S. & R. 69; Monongahela Navagation Co. *v.* Coons, 6 W. & S. 114; Smith's Comm. p. 513. The inquiry is, What would the citizen of average intelligence understand by the word? Commonwealth *v.* Dumbauld & Roberts, 9 W. N. C. 531. The commonly accepted meaning of "salary," is a fixed sum for a stipulated period of service. The standard dictionaries so define it. "An annual or periodical payment for services; a stipulated periodical recompense:" Webster. "Stated hire; annual or periodical payment:" Johnson. The idea of daily pay or wages never occurs in connection with the word salary. If any number of men were asked what they understood by a salaried officer, the uniform answer would be, one who receives a stated sum for a stated service, as for a year, a month or a session; the amount of such salary would never be thought of as so much a day. The meaning of salary—salarium—has never changed since it was coined during the Roman empire, to signify a round sum paid to officers or others for "salt-money," which represented all their pay for provisions and service: Pliny. The legislative use of the word accords with the popular signification: Acts of April 13th 1791, 3 Sm. L. 26; April 8th 1793, Id. 111; February 7th 1814, 6 Id. 106; April 17th 1843, § 7, P. L. 324; Salary Act of 1855, § 9, P. L. 495; April 21st 1858, § 4, P. L. 376, and numerous other Acts.

There can be no doubt that the framers of the convention used this word in the same sense, and it is a rule of construction that the constitution is to be construed in accordance with the intent of its framers: Pike County *v.* Rowland, 9 W. N. C. 241. The convention of 1874 struck out the word "compensation," in the constitution of 1838 (art. I. § 18), which was broad enough to cover all kinds of pay, and inserted "salary" and "mileage," with the avowed object of confining the pay for both to a stated sum per session: See 1 Deb. 513; 7 Id. 313. At that time the members of the legislature were paid session salaries, as were also the members of the constitutional convention.

It is argued that by "such salary" the constitution vests a discretion in the legislature to fix such kind of salary as they may choose, which would include per diem pay. Now the word "such" means "so much," and refers to amount. The kind

of salary is fixed by the constitution. The context dispels any doubt on this point : " shall receive such salary and mileage for regular and special sessions, as shall be fixed by law, and no other compensation whatever." One salary, to be fixed for the session, excludes other salaries to be fixed by the day, if the term could be so used. Moreover " such " refers equally to mileage, which may vary in amount but not in kind. Session and not annual salaries were appropriately provided for in view of biennial sessions.

The meaning of " salary," as applied in legislative acts to government officers, has been judicially construed to mean " an annual or periodical payment for services :" Cowdin *v.* Huff, 10 Ind. 83 ; Thompson *v.* Phillips, 12 Ohio St. 617.

The Act of 1874 does not fix any salary whatever—the word salary is not used in it. Its title is " An Act fixing the compensation of members of the General Assembly," &c., and it enacts, " That the compensation of members of the General Assembly," &c. In other acts the compensation of State offices is denominated salary, and such acts are called salary acts, which this is not. If the constitution permits a per diem allowance at all, there is no limit to the power of the legislature to vote themselves any amount of per diem pay for any number of days, in lieu of or in addition to a session salary, thus aggravating the evil the Constitution aimed to suppress.

Cheif Justice SHARSWOOD delivered the opinion of the court, February 20th 1882.

By the Constitution of Pennsylvania, art. II. § 1, " the legislative power of the Commonwealth shall be vested in a General Assembly which shall consist of a senate and house of representatives." Several restrictions are placed on this general grant, both as to its subjects and the mode of its exercise, by the Declaration of Rights, art. 1, and subsequent special provision. To justify a court in pronouncing an Act of the legislature unconstitutional and void, either in whole or in part, it must be able to vouch some exception or prohibition clearly expressed or necessarily implied. To doubt is to be resolved in favor of the constitutionality of the Act. This rule of construction is so well settled by authority that it is entirely unnecessary to cite the cases. It follows as a necessary consequence of this principle, that where the contention is as to the meaning of a word, as it is in this case, if any meaning, whether technical or popular, will sustain the exercise of the power, it is sufficient. On the other hand, if the strict and legal meaning would have the effect to limit or destroy, while some other popular acceptation of the word would support the legislative Act, it must be resorted to. So we understand Farmers' and

[Commonwealth *ex rel.* Wolfe *v.* Butler.]

Mechanics' Bank *v.* Smith, 3 S. & R. 63, and Monongahela Nav. Co. *v.* Coons, 6 W. & S. 101—relied on by the counsel for the defendant in error, in both which cases the constitutionality of the Act attacked was sustained.    It is a clear logical deduction from the premises already adverted to as well established.    The popular sense of a technical word, if it has a popular sense broader than the technical one, must be adopted, but not if the effect be to limit or restrain the general grant of power.

The application of this principle we think, solves the doubt (for after all it is only a doubt) as to the meaning of the word "salary," in the eighth section of article II. of the Constitution.

"The members of the General Assembly shall receive such salary and mileage for regular and special sessions as shall be fixed by law, and no other compensation whatever whether for service upon committee or otherwise.   No member of either house shall, during the term for which he may have been elected, receive any increase of salary or mileage under any law passed during such term."   The Constitution of 1776, ch. 11, § 17, declared :  "The wages of representatives in General Assembly and all other state charges shall be paid out of the state treasury."   This was no doubt intended to abrogate the common law by which the wages of members of the House of Commons were paid by the counties, cities or boroughs which they represented : 1 Blackst. Com. 174.   The same practice prevailed here in provincial times as may be seen by the Act of March 20th 1724–5 :  "An Act for raising county rates and levies, " 1 Dall. Laws 209, where in section 4, among the objects for which the commissioners of each county were authorized to levy taxes, one was "to pay for representatives' services in General Assemblies."   Under this Constitution the wages of assemblymen were fixed at a sum per day, and we find an Act of March 19th 1777, entitled "An Act to increase the wages of assemblymen:" 1 Dall. Laws 735.

No one will venture to say that wages, in the Constitution of 1776, necessarily meant daily wages, and that they could not have been fixed at a certain sum  per session or per annum. The framers of the Constitution of 1790 saw fit to change this word wages to compensation—doubtless, because they thought it a word more befitting the dignity and importance of the office, not that they intended to make any change in the rule.   "The senators and representatives shall receive a compensation for their services, to be ascertained by law and paid out of the treasury of the Commonwealth: Art. 1, § 18.    The convention of 1837–8 left the clause unaltered. Clearly no restriction was meant to be placed upon the legislature as to the amount or manner of ascertaining the rate of compensation, but they were left at liberty to adopt any mode

[Commonweallh *ex rel.* Wolfe *v.* Butler.]

they saw fit—by the day, by the month, by the session, or by the year. It was to be ascertained by law. Accordingly, the members continued to receive daily wages until 1855, when the compensation was fixed at a round sum per. annum, with an additional allowance of three dollars a day for every extra session, when convened by the executive, and a dollar and a half per day at every adjourned and extra session, when not convened by the executive. Act of May 7th 1855, § 9, 11, Pamph. L. 496. So it continued, with some increase in the amount, until the adoption of the present constitution.

If the framers of that constitution had gone back to the language of the constitution of 1776, and provided that "the members of the General Assembly shall receive such wages and mileage for regular and special sessions, as shall be fixed by law," the present contention would not have arisen. This may legitimately be inferred from the course of the argument for the defendant in error as to what would have been the effect of the word compensation as contained in the constitution, of 1790 and proposed and rejected in the constitution of 1873. Yet according to the most approved lexicographers, the words "wages" and "salary" are synonymous. They both mean one and the same thing: "a sum of money periodically paid for services rendered." How can we say that the people in adopting the constitution gave the word "salary" a more restricted meaning? It is said, and the stress of the argument seems to be here, that we are to inquire, not as to the proper meaning of the word, but as to the sense it has received in popular use. We have shown that this is a just and sound rule, to sustain a grant of power, but not to limit and restrict it. But where are we to look for the popular sense of the word? Surely not to the debates of the convention. Some of the members of that may have thought that the word "salary" would preclude "daily wages," which the word "compensation" would not. The majority, however, who contented themselves with voting without speaking, for all that appears, may have been of opinion that the word "salary" was as comprehensive as "compensation," and was a more fitting word to use in application to such an honorable and important position. If it had been their intention to prohibit a per diem salary, they could have easily said so in very few words. The truth is, and this the lexicographers seem to hold, that if there is any difference in the popular sense between "salary" and "wages," it is only in the application of them to more or less honorable services. A farmer pays his farm hands in common speech wages—whether by the day, the week, the harvest, or the year. If for any reason he has occasion to employ an overseer, his compensation, no matter how measured, is called a salary. An ironmaster pays his workmen wages,

[Commonwealth *ex rel.* Wolfe *v.* Butler.]

his manager receives a salary. A merchant pays wages to his servant who sweeps the floor, makes the fire and runs his errands, but he compensates his salesman or clerk by a salary. How can it make any difference in what way the compensation is ascertained? Had the Act of May 11th 1874, used the word " salary " instead of " compensation," " a salary of ten dollars per diem "—it would have been good English and perfectly intelligible to the common mind. When the constitution in other parts uses the words " fixed salaries " they were to take the place of fees—payment for services rendered from time to time—not periodical; but it is not easy to perceive why, if these salaries were appointed to be measured by the day, they would be any the less " fixed salaries."

It is contended that the evident object of the constitution in this section was to shorten the sessions of the General Assembly, and to hold out for this purpose to the members as an inducement that as they could not thereby increase their compensation, they would be unwilling to prolong their sessions. If this was the object, the word was very unhappily chosen. A much simpler and more effective mode would have been, to have provided a rate per day, diminishing from day to day as the session continued. It is hard to believe that the convention believed that the General Assembly would be influenced by so sordid and unworthy a motive. But they did mean evidently to provide, and they clearly expressed that meaning, that a legislature should not have power to pass any law which should have the effect of increasing the pay of its own members, and that they should under no circumstances receive any more compensation than that previously ascertained by law.

We ought to be careful not to hamper the power of the legislature by any narrow, strained construction. By the old Acts of Assembly, the provision for compensation to the members was generally, if not invariably, that the members should receive a certain sum " for every day they shall attend upon their respective duties." Act of April 13th 1791, 3 Sm. 26; Act of April 8th 1793, Ibid. 111. It may be very important hereafter, in view of what seems to be a growing evil,—frequent absence of the members,—to provide that members who are not present and do not record their votes on the final passage of bills, shall not receive their salary for that day. If, however, they must receive a round sum for the session, it would deprive the legislature of the power to make such a provision.

> Judgment reversed, and now judgment for the Commonwealth and peremptory mandamus awarded, and it is ordered that the record be remitted to the court below for the enforcement of this judgment.

Mr. Justice Trunkey filed the following dissenting opinion, February 27th 1882.

Having the conviction that the first section of the Act of May 11th 1874, clearly and palpably violates section 8 of art. II. of the Constitution, I would affirm the judgment of the court below. That Act, now sanctioned by the decision of this court, will likely be deemed in harmony with the Constitution during its life. I shall not undertake the bootless task of giving reasons at length, for the belief that it is repugnant in letter and spirit. At best, a dissenting opinion could be little more than an elaboration of the opinion of the learned judges of the Common Pleas, which so well sustains their judgment. To their reasons a few points might be added which, among many, were fully discussed by the counsel of the respective parties. I shall remark but one, namely, the Constitution declares that two specific forms of compensation for legislative service shall be allowed for entire, regular and special sessions, and forbids all others.

"The members of the General Assembly shall receive such salary and mileage for regular and special sessions, as shall be fixed by law, and no other compensation whatever, whether for service upon committee or otherwise." Const. art. II. § 8. They shall have salary and mileage for each session. This excludes salary for any other period. "Salary by the session is directed, and all other divisions of time are excluded. But salary by the session is for a session, is salary for the whole session, and not for a part; it is for the entire service of a member at any session paid for, and as plainly means one sum, as does salary for a year, or annual salary." The prohibitory words, aimed at committee service, by no reasonable interpretation, can limit or modify the declaration that the members shall receive no other compensation than the salary and mileage fixed by law for the session. The intention is to prevent any increase of the member's salary and mileage, after his election, as effectually as section 13 of art. III. prohibits the increase of the salary or emoluments of any public officer after his election. An uncertain sum does not meet the requirement. To fix a sum as salary and allow daily pay to be added, leaves it to the members to increase their compensation, while in office, very much at their pleasure. The word salary, as applied to session, means a stipulated recompense for service at the session, and was used with the context to prevent compensation by daily pay, to limit the pay of members to a certain sum, and is not synonymous with "wages" as used in the Constitution of 1776, or with "compensation" as used in the Constitutions of 1790 and 1838. In the prior Constitutions, the "wages" or "compensation" of representatives in the General Assembly, could

be ascertained by a law allowing a salary, or daily hire; the context did not limit to any mode, as does the Constitution of 1873. I think the words "such salary and mileage for regular and special sessions as shall be fixed by law," should be taken in their ordinary sense, as the people who adopted the Constitution commonly understood them. I believe they mean a stipulated sum for each session, and not daily wages, or daily hire, or salt money.